**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHERINE J. HENRY,** as Plenary Guardian of the estate of Wesley Jordan, | ) ) ) | |
| Plaintiff, | ) ) | No. 18 C 2230 |
| v. | ) ) | Magistrate Judge Gabriel A. Fuentes |
| **UNITED STATES OF AMERICA**, | ) ) ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this matter before the magistrate judge on consent (D.E. 64), the Court makes the following findings of fact and conclusions of law after a bench trial that occurred by video on January 25 through 29, 2021, in the United States District Court for the Northern District of Illinois. Plaintiff Wesley Jordan ("Plaintiff"), through his estate administrator Katherine Henry, has sued the United States of America ("Defendant")[1] under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680, under an agency theory for medical negligence. Plaintiff claims that Veterans Administration doctors Mikhail Vager and Christina Smith in placing a catheter, also referred to as a "central line," into Plaintiffs internal jugular vein moments before his scheduled May 19, 2015 cardiac bypass surgery, negligently inserted the catheter by penetrating the rear wall of the jugular vein and then perforating the wall of Plaintiff's right vertebral artery. The injury to Plaintiff's vertebral artery caused the medical staff at the Edward Hines, Jr. VA Hospital ("Hines")

---

[1] The Complaint (D.E. 1) initially named the United States and Dr. Christina Smith as defendants. On June 29, 2018, the Court dismissed Count II of the two-count Complaint and dismissed Dr. Smith as a defendant, leaving only the United States as a defendant. (D.E. 17.) Plaintiff filed an amended complaint on January 22, 2021, restyling the complaint to reflect the Court's dismissal ruling of June 2018 to leave only Count I (negligence) and the Defendant United States. (D.E. 105.)

near Chicago to abort the open-heart surgery, known as a Coronary Artery Bypass Graft or "CABG." The parties dispute the extent to which Plaintiff suffered a brain injury as a result of the May 19 procedure. The CABG procedure was rescheduled for, and took place on, May 26, 2015. The parties do not dispute that after the second surgery, Plaintiff was left profoundly disabled and unable to care for himself for the rest of his life. The parties dispute the precise manner in which the May 19 perforation or "cannulation" of Plaintiff's right vertebral artery occurred, and thus whether Defendant may be found negligent for having breached the applicable standard of care. Further, the parties dispute whether the May 19 event proximately caused Plaintiff's permanent cognitive loss, and whether, if Drs. Vager and Smith acted negligently on May 19 in cannulating the right vertebral artery, such negligence proximately caused Plaintiff's cognitive loss if the second CABG surgery was, as Defendant contends, the actual trigger for Plaintiff's permanent injuries. Those disputes are the primary disagreements in this matter, although a few others arose during the five-day bench trial. The following findings of fact and conclusions of law are the results of that trial.

**DISCUSSION**

I.      **Admission to Hines and Medical Evaluation**

1.      On or about May 7, 2015, Plaintiff, then 61, was admitted to the Hines after presenting to the emergency department with complaints of difficulty breathing and moving.

2.      Staff at Hines listed Plaintiff's health maladies as including signs of kidney failure and anemia, history of tobacco use and of cocaine and alcohol abuse, partial blindness from glaucoma, hypertension and degenerative joint disease. After his admission to the hospital, tests showed that he had substantial blockages of both his left and right carotid arteries. This condition is a form of coronary artery disease.

3.     The left carotid blockage was estimated to be 80 to 99 percent, and the right carotid blockage was estimated to be 50 to 79 percent.

4.     Doctors scheduled a May 19, 2015 CABG procedure to try to improve Plaintiff's blood flow by grafting a bypass around the blocked areas of those arteries, a major type of surgery typically done in conjunction with stopping the patient's heart while a "heart-lung machine" performs the patient's cardiopulmonary functions.

5.     At the time of Plaintiff's admission to the hospital, and before his May 19 procedure, he had been living on the third floor of a suburban YMCA, and he was making plans to move to another location because he had difficulty climbing stairs. Cognitively, he was able to converse and interact with others and generally feed and care for himself, although he may have required some minimal level of assistance. He did not require 24-hour, seven-day-a-week nursing care, as he does today, and he did not exhibit behavioral abnormalities.

## II.     The May 19 Procedure

### A.     The May 19 Anesthesiology Team and Dr. Vager's Failure To Determine Dr. Smith's Level of Skill and Experience

6.     The team of doctors assigned to the May 19 CABG procedure included two Hines physicians responsible for the administration of anesthesia and for placement of the catheter: Drs. Vager and Smith.

7.     Dr. Smith was a third-year resident physician. On May 19, she was engaged in a one-month cardiac anesthesiology rotation at Hines, as a part of her University of Illinois-Chicago residency program. The facts adduced at trial did not include any precise evidence of how many catheterizations, namely the insertion of a central line into a vein, she had ever performed. She testified that she was sure that Plaintiff's May 19 central line was not the first she had ever placed.

The Court was unable to determine whether she had performed more than one such catheterization in her career before May 19, 2015.

8.      Dr. Smith's role in the surgery included her placing the central line into the internal jugular vein, under the supervision of Dr. Vager, the attending anesthesiologist. At the time of Dr. Smith's one-month cardiac anesthesiology residency at Hines, the hospital had no training program in place to allow residents to practice the catheter placement technique on mannequins, according to a portion of Dr. Vager's testimony that the Court found credible.  Dr. Vager was an anesthesiologist with substantial experience in placing central lines as of the May 19 procedure. Dr. Vager testified that he wore sterile gloves but did not scrub himself before the procedure and was not wearing a full protective gown.  (Joint Exhibit 3 at 31.)  Hines policy required Dr. Vager to be scrubbed and fully gowned if he were to participate in the May 19 procedure (*id.* at 46), though Defendant's expert claimed that the standard of care does not require the attending anesthesiologist to be scrubbed and gowned.  (Tr. at 405.)

9.      Before Plaintiff's May 19 procedure, Dr. Vager had never worked with Dr. Smith, did not review any file documents about her experience (Joint Exhibit 3 at 6-7) and did not have a meaningful conversation with her about her experience. The extent and nature of Dr. Vager's previous exposure to Dr. Smith turned out to be an important issue in judging Dr. Vager's credibility and in evaluating whether his supervision of Dr. Smith met the standard of care.  The preparations for the anesthesiology portions of the May 19 procedure began shortly after 7 a.m. *on Dr. Smith's first full day* as a physician resident in the cardiac anesthesiology rotation at Hines, as Dr. Vager testified and as documents confirm.  (Joint Exhibit 3 at 17; Joint Exhibit 1, Bates pages 3297, 3299; Joint Exhibit 4 at 17.)[2]

---

[2] Dr. Smith testified, with her memory refreshed by an exhibit, that her rotation at Hines began on May 18, 2015 – one day before the May 19 procedure – and ended on June 15, 2015.  (Joint Exhibit 4 at 17.)  She

10.     Dr. Vager testified falsely about how well he knew of Dr. Smith and of her skill and experience level before the May 19 procedure, which he said occurred after Dr. Smith already had two weeks under her belt in the cardiac anesthesiology rotation.  He testified that Dr. Smith "was on our rotation already for two weeks at Hines VA.  I couldn't recall I did cases with her or not, but I know who she is and how she looks like …. [M]aybe I did some general cases with her, but … I don't remember."  (Joint Exhibit 3 at 7.)  Asked whether Dr. Smith was inexperienced at the time of the May 19 procedure, Dr. Vager misleadingly testified that "she's in training."  (*Id.* at 36.)  The Court finds that in actual fact, Dr. Vager did no "general cases" with Dr. Smith before the May 19 procedure, or at least no meaningful case. And the Court does not believe the portion of his testimony stating that he could not remember if he had done cases with Dr. Smith before.[3] If Dr. Vager knew who Dr. Smith was and what she looked like at the outset of the May 19 procedure, he *barely* knew anything about her.  If he had met her before at all, it was on her partial or full administrative day or in the short time before the morning start of the May 19 procedure. She had no "training" of which Dr. Vager could have been aware with respect to catheterizations.

11.     Despite not knowing Dr. Smith's skill level in placing catheters before the May 19 procedure, Dr. Vager did nothing to find out. Dr. Vager claimed that he asked Dr. Smith if she had done the catheterization procedure before and "she told me yes" (Joint Exhibit 3 at 14), but the Court finds this testimony to be false.  There is no support in the record to suggest that before the

recalled that her first day on the job (May 18) "may have been administrative," and this suggests that May 19 was indeed her first full day in the cardiac anesthesiology rotation, although her testimony on this point was that May 19 "could have been" her first day in the rotation and "could have been" her first catheterization at Hines.  (*Id.*)  Obviously, many things "could have been," but the Court concludes in its role as fact finder that May 19 was Dr. Smith's first full day practicing medicine in the cardiac anesthesiology residency at Hines.  Notably, she further testified that she could not recall having a day of training before her hands-on work as a physician at Hines.  (*Id.*)
[3] At another point, Dr. Vager testified that the May 19 procedure was the first "cardiac" case he had done with Dr. Smith.  (Joint Exhibit 3 at 5.)  At least that much was true.

May 19 procedure in which Dr. Vager was to supervise Dr. Smith, Dr. Vager had any meaningful conversation with Dr. Smith about her experience in placing catheters.[4] Hines had no such training platform for its residents (*see* id. at 12-13), and if it had, as least Dr. Smith would have remembered one. She did not. (Joint Exhibit 4 at 17-18.)

12.    Hines and its agent Dr. Vager threw a resident physician with little or no real training in placing catheters into a risky and potentially deadly scenario and relied entirely on Dr. Vager to engage in a minimally searching inquiry into the resident's skill and experience level in these catheterizations, so that the attending could exercise a proper level of supervision to protect patients. No such inquiry happened here. No such proper level of supervision occurred here. There was no evidence to suggest that Hines had a reasonably effective procedure in place to ensure that a supervising attending physician had an adequate opportunity to learn the clinical experience of a resident new to the cardiac anesthesiology rotation before sending her headlong into an operating room to perform catheterization of a vital vein near vital arteries. And this all occurred with the hospital not bothering to implement any formal or even informal training for residents on how to perform the procedure. Moreover, the fact that Dr. Vager was not sterile during the procedure supports the further inference that he was not prepared to supervise Dr. Smith adequately or to take over the procedure as he claimed he did. Only *after* the procedure does the record indicate that Dr. Vager spoke to Dr. Smith in any detail about catheterization practices and procedures, and then only by stopping her in the hallway outside the operating room and referring

---

[4] An additional indicator of Dr. Vager's lack of credibility on his having supposedly taken over this procedure is found in his strange and shifting testimony as to the amount of time it took him to "push" the dilator through. At first, he said he did so for a full minute. (Joint Exhibit 3 at 47.) Pressed on how counterintuitive that testimony was, in that the duration might reasonably be expected to last only a few seconds, Dr. Vager changed his testimony to 20 or 30 seconds. (*Id.*) The exact duration of this episode, which the Court believes to be fictitious in any event, is not important. What is important is that Dr. Vager, as he was testifying, was making it up as he went along.

her to several published medical articles because he did not see her as comfortable with the procedure and the manner in which he would prefer it done – as he put it. (Joint Exhibit 3 at 9-12.) The Court notes that any reasonable practitioner in this area would prefer that the procedure not be done in a way that resulted in a rare arterial cannulation. The evidence that Dr. Vager's only meaningful communication with Dr. Smith about this procedure – on her first real day on the job – was to point her afterward to several articles so she could read up on the procedure is further demonstration of his abject failure to supervise her before or during the May 19 procedure.

**B.     Dr. Smith's Placement of the Catheter During the May 19 Procedure**

13.     Placement of the catheter involves the use of a kit, an exemplar of which was supplied to the Court as Defendant's Exhibit 13. Placement begins with the anesthesiologist placing an insertion needle into the internal jugular vein with the aid of an ultrasound device. The purpose of the insertion needle is to allow for insertion, into the vein, of a guidewire before the needle is removed. The anesthesiologist then places an object known as a "Cordis sheath" over the guidewire, and the sheath device includes a dilator to open the vein widely enough to admit the sheath device. The guidewire and the dilator are then removed, and the catheter remains in the vein as a sort of "straw" into which medication may be administered. On May 19, 2015, Dr. Smith inserted the insertion needle, guided by the ultrasound device, into Plaintiff's neck. The ultrasound's guidance is imperfect, as it does not always show the entire length of the needle. It is undisputed that an error in inserting the needle into a vein, such as inserting it at too steep an angle, could result in serious injury or even a fatality if the needle damages an artery, including the inducement of a stroke from the release of clotting material, from the site of the injury, into the bloodstream and then to the brain, where the clotting material can clog small arteries within the brain.

14.     During the May 19 procedure, the posterior or rear wall of the internal jugular vein was perforated, and the wall of a nearby artery, the right vertebral artery, was punctured or "cannulated" near the junction between that artery and the right subclavian artery. Cannulation of the right vertebral artery is a known but very unusual complication, hardly ever seen, according to Dr. Vager. (Joint Exhibit 3 at 21, 34). Plaintiff's expert, Dr. Daniel Rubin, was able to recount one such recent event during his substantial experience in medicine and in training University of Chicago resident physicians in placing these catheters, and Dr. Vager recalled once such incident in his entire career. The incident Dr. Vager recalled occurred in or about 2002; Dr. Vager said it happened because a conscious patient turned her head toward him during the procedure, and he added that this injury might occur once in every 2,000 central line placements, describing it as "really, really, really rare." (*Id.* at 21-22, 43.) But the Court finds that the injury was reasonably foreseeable to Dr. Vager as a possible consequence of an erroneous insertion of the needle at too steep an angle, particularly where the physician inserting the needle required instruction and supervision and did not receive an adequate level of either. The cannulation of Plaintiff's right vertebral artery triggered a small stroke in Plaintiff's right cerebellum (as diagnosed by MRI and confirmed by defense expert Dr. Richard Bernstein (Tr. 540)) and forced the surgery team to immediately cancel the May 19 procedure and call in two vascular surgeons to explore and repair the damage to the right vertebral artery.

15.     The parties disputed the mechanism of injury. Plaintiff contended that the catheter's dilator, which is used to widen the vein's opening to allow for insertion of the catheter, caused the arterial injury. Defendant contended that the insertion needle caused the injury. The Court finds that more likely than not, the insertion needle caused the injury. The Court accepts defense expert Dr. Rubin's testimony that the insertion needle can cause this type of injury,

particularly if the needle is inserted at too steep an angle into the neck of a patient of Plaintiff's relatively thin stature. (*See* Tr. 395 ("[I]t would not be difficult to imagine, the needle does not need to be that far into the patient's neck for it to exit the posterior aspect [of the jugular vein being catheterized], no.").)  Dr. Rubin testified that "it was the needle, the needle that cannulated the vertebral artery as opposed to the dilator because the needle is designed to cannulate vascular structures …. If it was the dilator, which is much more blunt-tipped, it would be a much rougher kind of avulsed hole, and there would likely be much more ripping and/or tearing."  (*Id.* 402.)  He added that the resistance Dr. Smith reported feeling when she moments later sought to insert the dilator is a common occurrence.  (*Id.* 399.)

16.    The Court found plaintiff's expert Dr. Miles Dinner to be distinguished and credible, but the Court finds that his theory of injury – the dilator theory – more likely than not does not explain the cannulation of the right vertebral artery, because the end of the dilator is too blunt and has a flexible guidewire protruding from it.  Also, Dr. Dinner doubted that the insertion needle was long enough to reach the junction between the right vertebral and subclavian arteries, but he admitted that this question depended too on the angle of insertion:  "[I]f you do go lower," he testified, "you are likely to encounter the vertebral artery at a shallower depth than you would if you go at the standard point."  (*Id.* 124-25.)  Dr. Rubin credibly testified that the needle, and not the dilator, was the more likely mechanism of injury, offering exhibits from medical literature (Defense Exhibit 4 at 205, Table 1) showing that the mean distance between the posterior wall of the jugular vein and the vertebral artery were about 3 millimeters, "which is a very small distance when you're talking about a 2.5-inch needle."  (Tr. 397.)  The Court found Dr. Rubin's testimony more credible on this point than the testimony of Dr. Dinner and his reliance on a study of distances between artery and vein structures in a Korean population.  (Plaintiff's Exhibit 22.)

17.     Importantly, the experts and the Court were left to theorize about the cause of the May 19 arterial cannulation because neither Dr. Vager nor Dr. Smith, nor anyone else present at the time of the arterial cannulation, made any note, memorandum, or contemporaneous record describing or documenting what happened in the operating room on May 19 when the right vertebral artery was cannulated, other than a short, handwritten note (Joint Exhibit 1, Bates page 3297) indicating, incorrectly, that Plaintiff's carotid artery was cannulated.  Plaintiff's medical file at Hines is replete with written records of doctors and other medical staff relating various treatment events during his stay there and documenting his behavior, such as one day refusing to drink orange juice despite low blood sugar and another day refusing his eyedrops.  (*See generally* Joint Exhibit 1.)  The May 19 injury was plainly a significant event in Plaintiff's care. The two vascular surgeons who were called in to explore and repair the damage later prepared the only detailed memorandum of anything that occurred in the operating room that day, making even clearer the significance of the failure by Drs. Vager and Smith to prepare their own clinical note about what had happened during the attempted catheterization.   Dr. Michael Eng, the surgeon in the May 26 CABG procedure, testified instructively that he prepared or supervised the preparation of a detailed note about the May 26 CABG procedure, just as the vascular surgeons prepared a detailed note about the exploration and repair they performed to the cannulated vertebral artery on May 19, as these were significant events in the patient's treatment, and common medical practice called for such events to be memorialized.  (Tr. 348-50.)  Dr. Eng also testified that the May 19 procedure was such a significant event in Plaintiff's treatment.  (*Id.* at 350.)  But again, the doctors present for the cannulation did not document it.  When Dr. Vager was asked why he did not record any of these events in a surgical note, he said: "Because we're doing this every day, and, like, it was no difference from other insertion," even though in earlier testimony he described the cannulation of

Plaintiff's right vertebral artery as a "really, really, really rare complication" that might happen in one of every 2,000 central line placements and "almost impossible." (Joint Exhibit 3 at 24, 34, 43, 48.) In other words, Dr. Vager's excuse for failing, as the attending physician, to document the May 19 cannulation of Plaintiff's right vertebral artery – that it was "no differen[t] from [any] other insertion" – was patently false. The truth by a preponderance of the evidence is that Dr. Vager knew full well that he had presided over a grave mistake in the operating room on that day, and he did not memorialize it because he did not want that mistake memorialized. Moreover, his failure to ensure the preparation of a proper note about the May 19 procedure left Dr. Eng, on May 26 as he was about to embark on the CABG procedure, that much less informed about what had happened on May 19. (*See* Tr. 148 (affirming that the reason for preparing such notes is to allow later medical providers to understand what had happened with the patient earlier).)

### C. Dr. Vager's Claim That He Took Over the Procedure

18. Dr. Smith recalled that at some point as she was attempting to place the Cordis sheath into the vein through the use of the dilator, she encountered resistance and asked for help. (Joint Exhibit 4 at 13.) But it is not clear whether she ever received that help, or any help, from the supervising physician who barely knew her or her skills, Dr. Vager. But the Court finds that by the time she encountered resistance in placing the dilator, the arterial damage more likely than not had already occurred – from the insertion needle. Dr. Vager initially claimed a general lack of memory as to his own involvement at the critical point during the May 19 procedure. (Joint Exhibit 3 at 5.) The Court finds this testimony not credible, as Dr. Vager remembered the details of an arterial cannulation that occurred in 2002, and his testimony as to the rarity of this kind of injury suggests that he has a great deal more recollection than he set forth in his testimony. Indeed, near the end of his testimony, Dr. Vager contradicted himself, testifying that he took over the procedure

at a point when Dr. Smith was encountering resistance, or at some point, without precision as to exactly when.  (*Id.* at 43-47.)  The Court finds this testimony not credible, given that Dr. Vager suddenly remembered taking over after having testified initially that he did not remember doing so. In addition, in his sudden recollection, Dr. Vager appeared to have forgotten that earlier in his testimony, he had admitted to not being fully scrubbed or gowned, so participating in the surgery would have been a violation of hospital policy.  Regardless of Dr. Rubin's view that the standard of care does not require Dr. Vager to be scrubbed and gowned (Tr. 405), the Court considers Dr. Vager's not having been scrubbed or gowned in finding that he was ill-prepared to take over the procedure and did not actually take it over; his testimony that he did so was a last-minute fabrication designed to bolster his defense of his poor quality and quantity of supervision.

### III.    The May 26 CABG Procedure

19.    Plaintiff does not allege that the May 26 CABG procedure was negligently performed, although plaintiff argues that because the May 26 procedure was made necessary by the failed May 19 procedure, any injury that flowed from the May 26 procedure was negligently caused, in that the former procedure was a proximate cause of any injury that may have resulted from the latter surgery.  As for the May 26 procedure, there is no dispute that it was a contributing cause of plaintiff's permanent cognitive impairment.  (*Id.* 536.)  Defense expert Dr. Bernstein agreed that as a result, the May 26 procedure could not be labeled a success.  (*Id.* 538.)  But the parties dispute that the May 19 procedure, or the cerebellar stroke that resulted from it, proximately caused Plaintiff's permanent cognitive injuries that manifested themselves after May 26.  More specifically, Plaintiff argues that the cannulation of his right vertebral artery, and the deprivation of blood flow through that artery to the brain when coupled with the pre-existing blockages of his two carotid arteries at the time of the May 19 procedure proximately caused his permanent

cognitive injuries under a theory that on May 19, Plaintiff suffered a global "ischemic" injury to his brain, in the form of a hypoxic event in which the brain was deprived of oxygenated blood for a sufficiently long period to have left Plaintiff with a "penumbra" of damaged or dying brain cells that were further damaged, to the point of permanency, by the May 26 CABG procedure. There was no contemporaneous documentation in the record of how long the vascular surgeons clamped Plaintiff's right vertebral artery during the May 19 repair of that artery, but the clamping of that artery, in the opinion of Plaintiff's expert Dr. Nicholas Suite, reduced blood flow to Plaintiff's brain for at least "several minutes," although Dr. Suite was not able to estimate the percentage of blood flow reduction. (*Id.* 196, 265-66.) Dr. Suite further testified:

> [S]ubjecting this already injured brain with the penumbra to additional stresses of a major cardiac procedure, as well as effective anesthesia … pushed him over the edge. He had a penumbra consisting of some cells that were floppy, half-dead, ischemic. And just the process of undergoing the additional surgery would have put additional stress on his brain, causing him to have a permanent injury at that point…. [T]here is sort of a stacking phenomenon that takes place where initially following the first procedure, because of the ischemia that the brain was subjected to globally and focally, that certain nerve cells in sensitive areas were damaged and became partially functioning as opposed to fully functioning. And those partially functioning neurons weren't exposed to additional stresses of surgery a week later, so had effectively transformed into a permanency. But some of those cells in the first procedure were not going to make it because of the global ischemia, the decreased blood flow that came about as a result of the injury to the vertebral artery.

(*Id.* 275-77.)

20. The proposition that Plaintiff's severe and permanent cognitive injuries were triggered by the May 26 CABG procedure is not disputed, as Defendant's expert Dr. Bernstein conceded the point. (*Id.* at 537-38.) As to the nature of those injuries, the Court adopts the findings of fact as proposed by Plaintiff in this regard. (Plaintiff's Proposed Findings of Fact and Conclusions of Law (D.E. 102), ¶¶ 46-76.) In short, after the May 26 CABG procedure, Plaintiff showed significant signs of mental decline to the point where medical providers determined he

requires and will require, for the rest of his life, constant assistance with eating, grooming, bathing, dressing, toileting, bladder and bowel management, mobility, and locomotion, as well as extensive or total assistance with comprehension, expression, social interaction, problem solving, and memory. From the end of his Hines hospitalization to the present, he has been poorly oriented to place, time, and situation. He exhibits significant personality changes, combative behavior, bowel and bladder incontinence, balance deficits, inability to maintain a conversation, and general confusion. He was discharged to extended care at Hines in June 2015, and then to the Glenwood nursing home for rehabilitation in September 2015. Since December 2017, he has been at the Alden-Wentworth nursing home, where he receives 24-hour-a-day skilled nursing care and assistance with activities of daily living.

## IV. Applicable Law, Legal Conclusions, and Related Factual Findings

21. The Federal Tort Claims Act, under which this action is brought, provides that the defendant United States may be held liable in personal injury lawsuits for alleged negligence "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here, the alleged negligence occurred in Illinois, so the negligence claim is controlled by the substantive law of Illinois. *Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990). In Illinois, a plaintiff in a medical negligence case must prove the applicable standard of care, a provider's negligent failure to comply with the applicable standard of care, and a resulting injury proximately caused by the alleged negligence. *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 60 (citing *Sullivan v. Edward Hosp.*, 209 Ill. 2d 100, 112 (2004)); *Vargas v. United States*, 430 F. Supp. 3d 500, 510 (N.D. Ill. 2019).

### A. Standard of Care

22.     The standard of care under Illinois law "requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case in similar circumstances." *Purtill v. Hess,* 111 Ill. 2d 229, 242 (1986). The parties presented extensive expert testimony as to what standard of care was applicable to the May 19 procedure, and to the full range of care provided to Plaintiff at Hines in 2015.  As discussed above, the Court finds that the injury to Plaintiff's right vertebral artery was inflicted by the manner in which Dr. Smith placed the insertion needle. Considering the expert testimony carefully, the Court finds that Defendant, through its agent Dr. Vager, breached the standard of care by failing to supervise Dr. Smith appropriately to prevent the injury to Plaintiff's right vertebral artery by the mechanism of the insertion needle.

23.     Defense expert Dr. Rubin, whose testimony the Court credits considerably here, has helped develop a training course for all incoming University of Chicago residents for placement of central venous catheters, including a computer-based simulation, hands-on skill assessments, and practice upon mannequins.  (Tr. 364).  Dr. Rubin did not opine that such a formal training program is required to meet the standard of care, but the Court takes from his testimony at least some minimal training is necessary, particularly for a resident on her first real day in the rotation that was to involve her placement of such catheters, as opposed to nothing or virtually nothing, which is what Dr. Smith received here. There was no evidence to suggest that Hines had any formal or even informal training for new residents on how to perform the procedure. Instead, Hines relied entirely on its agent Dr. Vager to engage in a minimally searching inquiry into the resident's skill and experience level in these catheterizations, so the attending could exercise a proper level of supervision to protect patients.  No such inquiry or supervision occurred here.

24.     As to the standard of care for Dr. Vager's supervision of Dr. Smith, Plaintiff presented evidence through expert Dr. Dinner, who testified that Dr. Vager's supervision of Dr. Smith "fell below the standard of care," as Dr. Smith was a "novice" at the catheterization procedure and "reported that she was not experienced with this." (Tr. 112.) Dr. Vager nonetheless "allowed her to proceed" despite the risks to Plaintiff and then "needed to take over the procedure" once it became apparent that Dr. Smith was struggling with it. (*Id.* 113.) Dr. Rubin did not offer testimony that significantly rebutted Dr. Dinner's conclusion, as Dr. Rubin's opinion – that Dr. Vager did not breach the standard of care in his supervision of Dr. Smith – was based on Dr. Rubin's speculation about Dr. Smith's actual level of prior training in this procedure. (*Id.* 403.) Dr. Rubin testified that he "expect[ed]" Dr. Smith to have had previous exposure to central venous catheters during her prior internship and residency experience (*id.*), but when pressed, Dr. Rubin admitted that his expectation in this respect was based on his understanding of what he believed her training "must have been" because she was a senior resident. (*Id.* 444.) Asked whether he had any specific knowledge of Dr. Smith having received training on computer modules or mannequins, Dr. Rubin was forced to admit that he did not. (*Id.* 445.) Dr. Rubin agreed that less experienced medical providers could be expected to be involved in more complications from catheterization procedures, but he disagreed that Dr. Smith was learning this procedure "on the fly" during Plaintiff's May 19 surgery. (*Id.* 447, 450.) But the Court concludes as a matter of fact that this is exactly how she was learning, and this method breached the standard of care. The only evidence of Dr. Smith receiving any training or supervision at Hines in connection with the May 19 procedure, or from Dr. Vager, was Dr. Vager's having stopped her in the hallway outside the operating room *after* she had already cannulated Plaintiff's right vertebral artery and referring her to several articles because he did not see her as comfortable with catheterization practices and

procedures and the manner in which he would prefer it done – as he put it. (Joint Exhibit 3 at 9-12.)

25.     Moreover, Dr. Rubin's testimony that Dr. Vager's supervision of Dr. Smith met the standard of care was based on Dr. Rubin's assumption that Dr. Vager "took over that procedure" during Plaintiff's May 19 surgery (Tr. 405), but as the Court explained above, Dr. Vager's memory of taking over the procedure was suspect, and the Court concluded that his testimony was not credible.

26.     The testimony of Dr. Rubin and Dr. Dinner persuaded the Court that the standard of care at least required the attending physician to determine a resident's baseline skill level and past training before plopping her into an operating room to perform a cardiac catheterization, and to supervise her far more closely than Dr. Vager supervised Dr. Smith, knowing, as Dr. Vager should have known, that Dr. Smith had almost no experience performing this particular procedure. Through Dr. Vager's failure to supervise Dr. Smith to a level required by the standard of care, Defendant breached the standard of care.

27.     As for the standard of care during the performance of the May 19 procedure itself, Dr. Rubin opined that the insertion needle was the most likely mechanism of injury to the right vertebral artery, and that the question of whether insertion of the needle breached the standard of care depended on the angle at which it was inserted. (*Id.* at 386-87, 471-74.) In the opinion of Dr. Rubin, for the needle to inflict the injury seen here, the needle would more likely than not have to have been inserted at a relatively steep angle. (*See id.* at 472-74.) Dr. Smith, as Defendant's agent, breached the standard of care in penetrating the right vertebral artery with the insertion needle, notwithstanding her use of ultrasound as an imperfect guidance mechanism. The Court finds as a matter of fact that the angle and depth of the needle placement caused the injury, as the angle was

too steep, and the depth too great. Nonetheless, Dr. Smith is far less culpable here than Dr. Vager, because as a physician still in her training as a resident, namely a one-month cardiac anesthesiology rotation that she had begun only the day before at Hines, Dr. Smith was owed, under the applicable standard of care, a far greater level of training and supervision than Dr. Vager and Hines gave her. The Court relied on Dr. Rubin's testimony that if the angle and depth of the needle insertion was sufficiently severe, it could have cannulated that artery in contravention of the standard of care. Having accepted Dr. Rubin's opinion that the insertion needle – and not the catheter or its dilator, as Dr. Dinner opined – was the mechanism of injury, the Court concludes that the May 19 injury to the right vertebral artery resulted from Defendant's breach of the standard care in the supervision of Dr. Smith and in Dr. Smith's erroneous placement of the needle.

**B.      Plaintiff's Injuries**

28.      The fact that Plaintiff suffered severe and permanent injuries in this matter is not disputed, and the Court above has so found. (*See supra*, ¶ 20 (adopting Plaintiff's Proposed Findings of Fact and Conclusions of Law (D.E. 102), ¶¶ 46-76).) The key question in the case is causation.

**C.      Causation**

**1.      Applicable Illinois Law**

29.      The causation question here is whether the breach of the standard of care on May 19, namely the negligent supervision of Dr. Smith and the negligent cannulation of Plaintiff's right vertebral artery, proximately caused the significant and permanent cognitive injuries that both sides agree manifested themselves prominently and permanently after the May 26 CABG procedure, which was a contributory factor in the severity and permanency of Plaintiff's injuries.

30.     The Illinois Supreme Court defines "proximate cause" as embodying two distinct requirements:  First, "cause in fact," meaning "there is reasonable certainty that the injury would not have occurred 'but for' the defendant's conduct or where a defendant's conduct was a 'substantial factor' in bringing about the harm;" and second, "legal cause," which  "is established only when the injury is reasonably foreseeable, *i.e.*, when the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Steed v. Rezin Orthopedics & Sports Med.*, 2021 IL 125150, ¶ 37 (internal citations and quotations omitted); *Lee v. Chicago Transit Auth.*, 152 Ill. 2d 432, 455 (1992).  The Court has little trouble concluding that "but for" Defendant's negligence on May 19, the May 26 CABG procedure, which definitively triggered Plaintiff's injuries, would never have occurred.  The more difficult question is whether Plaintiff has met his burden of establishing proximate cause, which in Illinois is a question of fact for the trier of fact.  *First Springfield Bank v. Galman*, 188 Ill. 2d 252, 257 (1999); *see also Holton v. Memorial Hosp.*, 176 Ill. 2d 95, 107 (1997) ("Issues involving proximate cause are fact specific and therefore uniquely for the jury's determination.")  The standard of proof for Plaintiff is by a preponderance of the evidence, or whether the proposition is "more probably true than not true." *Holton*, 176 Ill. 2d at 105 (citing *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975)).

31.     Plaintiff's proximate cause theory is that the May 19 breach of the standard of care proximately caused Plaintiff's permanent injuries because it increased the risk of harm to Plaintiff from the May 26 CABG procedure.  (*See* Plaintiff's Brief on Proximate Cause ("Pl. Br."; D.E. 126) at 5-6.) Plaintiff argues that the May 26 CABG procedure may have been the last cause of his injuries, but that the May 19 procedure could also have been a cause and need not have been the sole cause or the last cause. (*Id.* at 5.)

32.    This is the "lost chance" or "loss of chance" rule of proximate cause, which "refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or *increased the risk of an unfavorable outcome to the plaintiff*." *Holton*, 176 Ill. 2d at 111-12 (emphasis added).[5] And this precise formulation of proximate cause is the one on which Plaintiff here relies. Pl. Br. at 5-6.[6] Under this theory, the plaintiff need not show that he or she would have received a "better result" if the

---

[5] In *Holton*, the Illinois Supreme Court resolved a conflict among Illinois courts in the application of the lost chance rule, holding that a plaintiff may present evidence that a defendant's malpractice, to a reasonable degree of medical certainty, proximately caused increased risk of harm or lost chance of recovery, whether or not the plaintiff was able to prove that he or she would have enjoyed a greater than 50 percent chance of survival or recovery absent the alleged malpractice of the defendant. 176 Ill. 2d at 119.

[6] Plaintiff's reliance on the "increased risk" formulation of proximate cause takes a few different forms. In one, Plaintiff cites the formulation found in Illinois Pattern Jury Instruction 15.01 on proximate cause:

> When I use the expression "proximate cause," I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.

Illinois Pattern Jury Instructions, Civil 15.01, Proximate Cause – Definition (Sept. 2009); (Pl. Br. at 1). Plaintiff argues that the May 26 CABG procedure may have been the last cause of his injuries, but that the May 19 procedure could also have been a cause and need not have been the sole cause or the last cause. In another, Plaintiff relies on Section 460 of the Restatement (Second) of Torts (1965), which makes a negligent actor liable where an initial injury "impairs the physical condition of another's body," and the plaintiff sustains harm in "a subsequent accident which would not have occurred had the [plaintiff's] condition not been impaired." (Pl. Br. at 5.) The Illinois Appellate Court, Fifth District, applied Section 460 of the Restatement (Second) in *Stephenson v. Air Prods. & Chems., Inc.*, 114 Ill. App. 2d 124, 132-33 (5th Dist. 1969), but for the general proposition, consistent with *Holton*, that whether negligent infliction of an initial injury caused the harm resulting from a second injury is a question of fact for the jury. The Court is folding these arguments into Plaintiff's reliance on *Holton* and "increased risk." In an apparent search for even greater clarity under Illinois law, the First District of the Illinois Appellate District Court recently reversed a no-liability verdict against a plaintiff where the trial court refused to instruct the jury on the *Holton* "lost chance" theory of proximate cause and gave only the IPI 15.01 proximate cause instruction. *Bailey v. Mercy Hosp. and Med. Ctr.*, 2020 IL App (1st) 182702, ¶ 116, *appeal allowed*, 2021 WL 1233059 (Ill. Mar. 24, 2021). *Bailey*, notwithstanding whether it is reversed on the question of how Illinois courts should instruct juries as to the lost chance rule, at least confirms the continuing viability of *Holton*'s "increased risk" methodology as supplying the correct proximate cause analysis under Illinois law for an injury that occurs secondarily to some initial medically negligent act.

defendant had administered proper treatment.  *Id.* at 107.  Moreover, where the plaintiff contends that "the defendant's conduct increased the risk of harm to the patient or lessened the effectiveness of the patient's treatment," the plaintiff is "not required to show in absolute terms that a different outcome would have occurred, as such certainty is never possible." *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 70.  In *Borowski*, a plaintiff's legs were injured in an auto accident, and the plaintiff argued that negligent medical treatment of his injuries, including a delay in his surgery, proximately caused complications that resulted in one of his legs being amputated; the Illinois Supreme Court held that a plaintiff could establish proximate cause without having to prove that a better result would have been obtained if the defendant had administered proper treatment.  60 Ill. 2d at 424.

33.     One case is particularly instructive on the "lost chance" theory of proximate cause. In *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, a plaintiff sued over the death of her husband from a case of sepsis that developed as a complication from surgical procedures undertaken to repair damage to the decedent's bile duct, which was cut open during an earlier, negligent procedure.  Plaintiff presented expert testimony that the severing of the bile duct necessitated a second procedure that caused the duct to "scar down" and cause a bile leak that led to a "domino effect of problems" that led to her husband's death.  *Id.* ¶ 22.  The jury found for plaintiff, and defendant appealed entry of judgment on that verdict, but the Illinois Appellate Court, First District, affirmed, holding that "[a] plaintiff must present at least *some* evidence on every element of the cause of action" and citing *Holton* for the proposition that a plaintiff establishes proximate cause by expert testimony "to a reasonable degree of medical certainty" under a preponderance-of-the-evidence standard.  *Id.* ¶ 60 (emphasis in original).  The First District held that there was no "total failure or lack of evidence" that would have necessitated overturning the Circuit Court's

judgment. *Id.* ¶ 62. Plaintiff's expert's testimony that the decedent had an "increased risk of a cut common bile duct as opposed to just the continuing ongoing risk of an avulsed one which would have been less injured and required more minor repair and therefore [would have entailed an] increase[d] chance of recovery" was sufficient to allow the judgment for plaintiff to stand, notwithstanding contrary expert testimony offered by the defendant, which the jury either did not believe or did not find reliable. *Id.; see also Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 16 (reversing Circuit Court's judgment notwithstanding a verdict of medical malpractice liability where plaintiff had presented expert testimony that the plaintiff decedent's chances of recovery from cervical cancer were lessened by defendant's negligent failure to diagnose it earlier, under a "lost chance" formulation of proximate cause under *Holton*); *Gulino*, 2015 IL App (1st) 131587, ¶ 71 (affirming the jury's verdict finding the defendants proximately caused the decedent's death despite contradictory expert testimony from the defendants, where the plaintiff's expert testified that the defendant's failure to properly and timely treat the decedent's condition decreased the decedent's chance of survival); *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 65 (affirming jury's determination that the defendant physician's failure to refer the decedent to a gastroenterologist delayed the decedent's diagnosis of pancreatic cancer and proximately caused the decedent increased risk of harm or lost chance of recovery from pancreatic cancer where the plaintiff presented "some evidence that the alleged negligence proximately caused the increased risk of harm or lost chance of recovery to a reasonable degree of medical certainty" through expert testimony that the decedent was two to six times more likely to survive five years had she been diagnosed earlier). Accordingly, whether an Illinois medical malpractice plaintiff proceeds under an "increased risk" or a "lost chance" theory of proximate cause, Illinois courts have held that

verdicts of liability are supported if plaintiffs present at least "some" evidence of such proximate cause to a "reasonable degree of medical certainty."[7]

### 2. Evidentiary Analysis

34.    As for evidentiary support in this record for the proposition that Defendant's breach of the standard of care in the May 19 procedure proximately caused Plaintiff's permanent injuries from the May 26 CABG procedure under Illinois law, consistent with *Holton* and *Vanderhoof*, the Court finds Plaintiff's expert Dr. Suite more reliable and credible on this point than Dr. Bernstein, for the reasons catalogued below.

### a. The Experts' Disagreement on Proximate Cause and Their Relative Credentials

35.    Drs. Suite and Bernstein are both credentialed. Both have significant and relevant experience in the field of neurology. Both analyzed this case differently, and for starters, the Court finds more persuasive Dr. Suite's analysis concluding that the blockage of blood flow through the right vertebral artery during the several minutes of repair necessitated by the May 19 arterial cannulation damaged Plaintiff's brain cells in a way that made him susceptible to an increased risk of harm during the May 26 CABG procedure. The harm Plaintiff suffered after the May 26 CABG procedure was not immediately triggered by Defendant's negligence on May 19, but that negligence proximately caused Plaintiff's injury by increasing Plaintiff's risk of that injury from

---

[7] The Court struggles somewhat with precisely what "reasonable degree of medical certainty" means, and the phrase has the ring of "reasonable degree of scientific certainty," a phrase criticized as misleading to jurors insofar as it might overstate the degree of certitude in an expert conclusion. *See* David H. Kaye, "Firearm-Mark Evidence: Looking Back and Looking Ahead," 68 *Case Western Reserve L.R.* 723, 735 & n.72 (Spring 2018). This phrase is not practically distinguishable from "reasonable degree of medical certainty." *Burke v. Town of Walpole,* No. Civ. A 00-10376, GAO, 2004 WL 507795, at *38 n. 142 (D. Mass. Jan. 22, 2004). This Court is sitting as the fact finder here and will not be misled by the phrase, which, for better or worse, is part of the lexicon of the applicable substantive Illinois law. Typically, under Federal Rule of Evidence 702, experts are not required to the testify to the degree of their certitude about their conclusions.

the May 26 CABG procedure. *See Holton,* 176 Ill. 2d at 111; *Vanderhoof*, 2015 IL App (1st) 132927. ¶¶ 60-62. Preliminarily, the experts agreed that Plaintiff at least could have been at increased risk from the May 26 CABG procedure by virtue of having to be subjected to anesthesia a second time. (Tr. 220, 594.) But the deeper and more trenchant disagreement was over Dr. Suite's theory of increased risks from damaged brain cells from the May 19 procedure, pushing Plaintiff "over the edge" as a result of the May 26 CABG procedure. (*Id.* 275-77.)

36. The Court considered this disagreement carefully. Asked about Dr. Suite's theory that the May 19 procedure damaged Plaintiff's brain cells and thus placed him at increased risk from the May 26 CABG procedure, Dr. Bernstein said:

> I honestly have no idea what that's even supposed to mean …. And not because of your summary, because the underlying science behind it just doesn't make any sense to me…. I just don't understand what it would – what process he's supposed to – is supposed to be described by that hypothesis. I just don't understand it.

(*Id.* 532.) Dr. Bernstein gave no reason for this opinion, other than to imply that notwithstanding his vast education and experience in the field of neurology, he knew of no scientific basis for Dr. Suite's theory. For the Court, this aspect of Dr. Bernstein's rejection of Dr. Suite's theory of increased risk was too close to an *ipse dixit* opinion, or one not connected to any supporting data or research, insofar as none was presented. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Black's Law Dictionary 828 (6th ed. 1990) (defining *ipse dixit* as "a bare assertion resting on the authority of an individual"). Expert opinions under Federal Rule of Evidence 702 must be "reasoned and founded on data." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). Neither party sought to exclude the other's expert opinion on proximate cause, based on a lack of reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), so the expert opinions were admitted into evidence at trial. The Court perhaps could have performed its own independent research outside the record to support the reliability of an expert

conclusion in either direction, as our court of appeal occasionally has done, even where *Daubert* motions were litigated. *See United States v. Clacy Watson Herrera*, 704 F.3d 481, 486-87 (7th Cir. 2013). Sitting as a fact finder at trial, this Court opted not to do so.

37. The Court weighs the conflicting expert testimony based on any reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case, as our court of appeals instructs jurors to do. *See* Seventh Circuit Pattern Civil Jury Inst. 1.21 (West 2010). As for credentials, Dr. Bernstein is the medical director of the stroke program at Lake Forest Hospital, the medical director of the telehealth program at Northwestern Memorial Hospital, and a professor of neurology holding the distinguished physician chair in vascular neurology at Northwestern University's medical school. (Tr. 478.) Defendant characterizes Dr. Suite as someone who "focuses on providing reports and evaluation for neurotrauma patients in litigation" (United States Post-Trial Brief on Proximate Cause ("Def. Br."; D.E. 128) at 1), and Dr. Suite admitted to having testified some 100 times and to having a neurotrauma patient base in which the vast majority come to him in connection with litigation. (Tr. 247-48.) On the other hand, Dr. Suite's qualifications include 28 years as a practicing neurologist, his residency training in neurology at the University of Miami School of Medicine and the New York Hospital – Cornell University Medical Center, and 15 years of teaching experience on the faculty of the University of Miami School of Medicine. (Plaintiff's Exhibit 30.) Dr. Bernstein may be the more credentialed of the two experts, but Dr. Suite's credentials are not so insignificant as to allow the Court to accept Dr. Bernstein's dismissal of Dr. Suite's increased risk theory, without more. And if having testified repeatedly as an expert is somehow a strike against that person's credibility, and the Court believes it is not, Dr. Bernstein has testified 15 to 20 times at deposition himself. (Tr. 483.) Further, as discussed below, the Court

also looked at all of the evidence in the case in weighing the two experts' opinions and finding Dr. Suite's opinion more reliable and credible.

### b.    The Experts' Respective Looks at the Evidence as a Whole

38.    The parties offered a considerable amount of evidence on the question of how a brain injury, or as Dr. Suite put it, a "global ischemic injury" to Plaintiff's brain, could have manifested itself as a result of the May 19 surgery.  The premise that Plaintiff sustained a global ischemic injury to his brain was important to Dr. Suite's theory, because without it, Dr. Suite would not have a basis to opine that Plaintiff's severe and permanent cognitive injuries were connected causally to the May 19 surgery and the negligent errors that occurred during that surgery.  The experts disputed the significance of a series observations, by medical personnel, of Plaintiff after the May 19 procedure.  Dr. Suite reviewed hospital records of various encounters between Plaintiff and hospital staff, including nurses, speech pathologists, and behavioral therapists, indicating that between May 19 and May 26, Plaintiff engaged in behaviors such as refusals of treatment (such as injections of the anti-coagulant drug Heparin, eyedrops, and diabetes-related treatment and testing), verbal abusiveness toward hospital staff, and initially refusing to be washed before the May 26 surgery. (*See, e.g.*, Joint Exhibit 1, Bates nos. 6935, 6938, 6906, 6892, 6872.)

39.    Dr. Suite's conclusion from these records was that they evidence an increased level of confusion or cognitive loss on Plaintiff's part (*see* Tr. 206-10), particularly given that medical records and deposition testimony in the case from Plaintiff's brother and mother indicated that he did not exhibit those kinds of behaviors before May 19, and that these behaviors were unusual for him.  (*See* Joint Exhibit 1, Bates no. 5579; Tr. 156; 210-11.)  Those behaviors, and the changed aspect of Plaintiff's behavior, were enough to cause Dr. Suite to opine that Plaintiff had suffered

a global ischemic injury to his brain, from a deprivation of blood and oxygen during the May 19 procedure, whereas Dr. Bernstein disagreed.

40.    Drs. Bernstein and Suite took vastly different approaches to Plaintiff's two neurology consultations or progress notes.  (*See generally* Joint Exhibit 1, Bates nos. 6962, 7038.) Neither side disputed that the consultations showed no outward indication of global brain injury. Dr. Bernstein concluded from this fact that no global injury could have occurred from the May 19 surgery because he was looking for catastrophic manifestations of such an injury as evidence of one, and he found none in the vascular surgeons' report of their artery repair.  (Tr. 484-86.)  But his theory does not account for the possibility, as advanced by Dr. Suite, that the injury from Plaintiff's May 19 procedure could have been much more subtle, but still dangerous enough to place Plaintiff at an increased risk of severe injuries from the May 26 CABG procedure.  Moreover, Dr. Bernstein repeatedly dismissed Plaintiff's treatment refusals, verbal abusiveness, and aberrant behavior between May 19 and 26 as clinically insignificant, at one point stating with some smugness that if he were told that a patient was refusing Heparin, he would ask the provider why he or she is calling a neurologist. (*Id.* 556, 559.)  In Dr. Bernstein's view, hospital patients refuse these sorts of treatment all the time, and this behavior is not a sign of neurological damage; it simply may indicate that the patient is frustrated. (*Id.* 558, 572.)  But importantly, in the Court's view, Dr. Bernstein was overly dismissive of the records of May 19 through 26, *except for* the neurology consultations, which supported Defendant's theory in this case.  He did not consider at all the evidence from Plaintiff's mother and brother that after May 19, Plaintiff showed a marked cognitive decline, and this evidence included the brother's testimony that Plaintiff mentally declined after the May 19 procedure but before the May 26 procedure, and the mother's report to medical staff in January 2016 that Plaintiff had mentally declined after the first surgery.  (Tr. 155-

56, 211; Joint Exhibit 1, Bates No. 5579.)  The Court will discuss Dr. Bernstein's not having

considered this evidence further below in judging his credibility, but the point here is that the Court

agrees that a patient refusing Heparin, or a blood-sugar test, or eyedrops, for example, ought not

to be evidence of a neurological problem when viewed individually or in isolation, as Dr. Bernstein

viewed them.  The context here, though, is a May 19 surgical procedure that had to be aborted and

that resulted in a vascular repair that clamped one of the four arteries taking blood to the brain of

a patient with near-total blockages in two of the other three arteries, amid signs of a small right

cerebellar stroke.

     41.     Despite characterizing Plaintiff's post-May 19 symptoms as clinically insignificant

regardless of what Plaintiff had endured on May 19, Dr. Bernstein made several important

concessions:  (1) global brain injury is a possible result of damage to the right vertebral artery; (2)

his opinion about the lack of a global brain injury on May 19 could be different if Plaintiff

displayed signs of brain impairment or encephalopathy in between the procedures; (3) signs of

encephalopathy, such as confusion, can wax and wane in a patient; (4) Plaintiff showed at least

some signs of confusion and/or encephalopathy soon after the first surgery; (5) difficulty in

carrying on a conversation (as reported in Plaintiff by his brother after the May 19 surgery) or

difficulties with memory (as reported by Plaintiff's mother) are signs of global brain injury; and

(6) Plaintiff after May 19 and before May 26 displayed a pattern of refusal of treatment.  (Tr. 539,

547-56, 561-77.)  The point about the waxing and waning of encephalopathic symptoms was

particularly important, because Dr. Bernstein based his opinions almost entirely on the two

neurological evaluations after the May 19 procedure, to the exclusion of all other behavior by

Plaintiff in the presence of other Hines care providers, and in the observation of Plaintiff's brother

and mother.  If symptoms of brain injury wax and wane, as Dr. Bernstein admitted, then they may

well have waned at the time of the neurological consults, and an expert evaluating the evidence *post hoc* to draw a conclusion about whether Plaintiff had a brain injury from the May 19 procedure should at least consider all of the evidence, and not just the two snapshots that supported Defendant, even though those were conclusions of neurologists with expertise in that area. For his part, Dr. Suite acknowledged that "there was no reported compromise[], of course, in the neurology notes – the two neurology notes. *But everyone else seemed to weigh in on his neurological impairment in terms of the staff and also the family.*" (Tr. 278 (emphasis added).) The Court found the following portion of Dr. Suite's testimony particularly persuasive:

> Q.      And why is it that you cannot look at Mr. Jordan in one moment in time to determine the extent of his cognitive injury?
>
> A.      Again, the secret is that – in medicine is the repeat examinations, and you have to see the patient several times to get a better feel for what's going on. So, that's where the medical records come into play. And we demonstrated that prior to the surgery where he was seen sequentially by the staff, observed to have a certain level of function which was unimpaired; and, then, following the first procedure again had serial examinations by the same staff that documented impairment. And, so, that's very important to figure out. *The big picture, not just an isolated moment.* You can have waxing and waning of symptomology, especially when neurons are partially injured and may be trying to survive, struggling to survive, trying to die; and you will get variations in the examination that you have to pick up on. And if you see that, you document it. And the staff did do that. Neurology visits, however did not apparently pick that up.

(*Id.* 281-82 (emphasis added).)

42.      In short, the Court does not accept Dr. Bernstein's thesis that the lack of evidence of neurological impairment in the two neurology consults between May 19 and May 26 ends the inquiry or requires a conclusion that the May 19 procedure inflicted no global brain injury. Because Dr. Suite's testimony was based more on the evidence as a whole, including the evidence from Plaintiff's family (which, as we discuss further below, Dr. Bernstein did not consider at all), the Court finds Dr. Suite to be the more reliable of the two expert witnesses on the critical question

of whether the negligence associated with the May 19 procedure proximately caused Plaintiff's permanent cognitive injuries as triggered by the May 26 CABG procedure.

> ### c. The Experts As Advocates and the Respective Credibility of Their Approaches to the Evidence

43.     As for the relative credibility of the two expert witnesses on the critical question of proximate cause, the Court found Dr. Suite more credible, notwithstanding Defendant's arguments to the contrary. At times during the trial, both witnesses strayed into advocacy. Dr. Suite, for example, resisted acknowledging prior inconsistent deposition testimony and said he feared being "set up" by defense counsel. (*Id.* at 260.) Dr. Bernstein refused to give ground and admit that a blood glucose reading of 61 constitutes low blood sugar, insisting that he did not know, as he was not an endocrinologist. (*Id.* at 563.) The Court viewed that testimony as akin to an orthopedic surgeon or an oncologist testifying that he or she does not know that a heart rate of more than 100 beats per minute is an elevated heart rate because he or she is not a cardiologist. But to make a credibility judgment on the respective proximate cause opinions, the Court ultimately turned back to the subject of the discussion immediately above, namely the manner in which the respective experts approached the body of evidence in this case.

44.     On the questions underlying proximate cause, Defendant, in its brief, helpfully delineated the changes in Dr. Suite's testimony from his deposition through the trial, arguing in effect that it was Dr. Suite who was "flopping around" more than the semi-dead brain cells he said were flopping around after the May 19 surgery. (Def. Br. at 4-5.) Defendant noted that Dr. Suite, in his deposition, held the general view that Plaintiff's cognitive impairments squarely resulted from the May 19 surgery but then vacillated at trial to an opinion that the May 19 surgery precipitated the brain injury triggered more conclusively at the May 26 CABG procedure. (*See id.* at 5 (citing Tr. 249-51, 255-56, 270-71).) At trial, Defendant notes, Dr. Suite described, from the

medical records, significant neurological impairments after the May 19 surgery (but before the

May 26 CABG procedure) and drew a causal connection between the May 19 surgery and

Plaintiff's permanent injuries that "persisted after the second [May 26] event." (*Id.* (citing Tr. 229-

31, 251, 253, 270).)

     45.    Defendant's quoted portions of Dr. Suite's changed testimony left out his

explanation of why he changed his opinion, and that explanation is as follows:

> Q.    Why at the time when you gave your first deposition did you believe it was less likely that the second procedure caused Mr. Jordan's permanent cognitive impairment?
>
> A.    I changed, I said what I said at that time because when I became aware, when I read Dr. Bernstein's report and I saw that he had given considerable weight to the second procedure as playing a role, I went back and I looked at the records of the operation itself. I looked at the records of the second operation on the 26th. I looked at the family statements. And I looked at his way of thinking. And again, you know, with great respect, I felt that, you know, I should consider the second procedure, which is the May 26th accident as being perhaps a bit more contributory than I had initially considered just because of the standard risks that are present with any kind of major coronary disease, which he went to great pains to point out. And, again, I just augmented my opinion by saying yes, well, yes, it's still possible, but I still feel that the major contributing cause was that May 19, 2015 aborted procedure due to the injury to the vertebral artery or the vascular mechanisms that I have already talked about, that is the low blood flow and the focal injury to the cerebellum as being the triggering event that then manifested all of the consistent and persistent signs and symptoms all reported in the intervening time between the first event and the second event and then persisted after the second event.
>
> Q.    But during your first deposition, why was it that you believed it was less likely that the second procedure caused the permanent cognitive injury?
>
> A.    When I looked at the second procedure, I saw no record of any complication that took place. There was no concern by Dr. Eng that there was any complication in terms of the way the procedure had gone.
>
> Q.    If Mr. Jordan had undergone the CABG as scheduled on May 19, 2015 without injury to the right vertebral artery, do you believe that he would have suffered the same type of impairment that he currently does today?

A.    No.

Q.    Why not?

A.    Again, there would have been a fixed risk that would have been attendant with that uneventful procedure, but instead he was in a different kind of position where he had already had a brain injury due to the first procedure that then unfortunately stacked on to the second procedure as well and had a cumulative deleterious effect.

(Tr. 230-32.)

46.    The Court uses its common sense in weighing the evidence as a fact finder. Seventh Circuit Pattern Civil Jury Instruction 1.11 (West 2010). In the Court's view, Dr. Suite's significant adjustment in his testimony to account for Dr. Bernstein's opinion – namely that the severe cognitive deficiencies sustained by Plaintiff resulted from the second surgery – does not destroy his credibility as an expert witness but rather bolsters it in this complex case turning on the causal relationship between the May 19 arterial cannulation (and resulting minutes-long reduction of blood flow to Plaintiff's brain) and the complications that followed the May 26 CABG procedure. *See* Ralph Waldo Emerson, *Essays: Self-Reliance* (1841) ("a foolish consistency is the hobgoblin of little minds").

47.    Plaintiff's theory, again, was that proximate cause under Illinois is satisfied because the May 19 procedure increased Plaintiff's risk of injury from the second procedure. Dr. Suite's changed opinion was fully disclosed before trial in a supplemental report (Plaintiff's Exhibit 31), and he testified at trial to the reasons behind the subtle change, in which he held to the view that the May 19 procedure caused the injury but added, to account for Dr. Bernstein's views, that the May 26 was a contributing factor under his "stacking" theory. The Court placed greater weight in Dr. Suite's opinion notwithstanding the fact that it changed. In large part, the Court's giving greater credit to Dr. Suite's testimony stems from his having stated that he looked at all of the

evidence in the case, including the two neurology consultations as well as the evidence from Hines medical providers and Plaintiff's family that Plaintiff's affect had indeed changed after May 19 but before May 26.

48. The Court was further persuaded by the manner in which Dr. Bernstein completely disregarded the family members' evidence. Plaintiff's brother, Preston Jordan, testified that Plaintiff was "his usual self" before May 19, with no problems with memory of conversation, but that in the days after May 19, Plaintiff was "unresponsive," "confused," "lethargic," and "unable to have a meaningful dialogue with me." (Tr. 151-56.) Dr. Bernstein acknowledged that this testimony was consistent with the Preston Jordan deposition testimony that Dr. Bernstein had available to him before rendering his opinion. (*Id.* 577.) In addition, when Plaintiff was seen by a neuropsychologist on January 7, 2016, Plaintiff's mother was present for the assessment and told Hines medical staff that Plaintiff sustained "a marked memory decline subsequent to a stroke experienced during an initial attempt at a coronary artery bypass graft (CABG) procedure, conducted, per record, on May 19, 2015; she said the patient was slow to come out of anesthesia." (Joint Exhibit 1, Bates no. 5579.) Dr. Bernstein admitted that the symptoms Preston Jordan reported seeing in the days after May 19 were consistent with encephalopathy (which he also had indicated was synonymous with confusion) and thus consistent with global brain injury. (Tr. 577.) But as far as Preston's testimony was concerned, Dr. Bernstein claimed variously that he had no reason to doubt it, that he did not have an opinion of its veracity, and *that he did not consider the testimony at all.* (*Id.* 577, 579.) As for Plaintiff's mother's report to the neuropsychologist, Dr. Bernstein did not dispute that she reported a marked memory decline in Plaintiff after the May 19 procedure, but he repeatedly labeled the report as "the truth as she sees it," while he did not accept it as fact. (*Id.* 578-79.) Nor did he consider the mother's statement in formulating his opinions in

the case.  (*Id.* 579.)  He then changed his testimony to say that he "must have considered it" because he reviewed it and took notes on "the things that I thought were relevant," despite the mother's statement not being one of them.  (*Id.* 580.)  Dr. Bernstein further explained that in his practice of reviewing a medical file for signs of global brain injury or "hypoxic ischemic encephalopathy," he does not "go crawling through the nurses notes looking for whether there was a refusal of an injection of Heparin or what the family said *years later* when there's a neurological examination right after the incident in question to which I attribute much more weight."  (*Id.* 581 (emphasis added).)

49.      Yet the truth was, as Dr. Bernstein essentially admitted, he did not place "more weight" on  the neurological examinations than he did in the reports from the family – he placed no weight on  the family's evidence and did not see it as relevant at all, and he refused to accept it as fact without providing a basis for that rejection.   The two uneventful neurological examinations are not enough to support Dr. Bernstein's wholesale rejection of the family members' observations, as well as the nursing and other provider notes between May 19 and May 26, in large part because Dr. Bernstein admitted that encephalopathic symptoms wax and wane, and that the family's reports, if accepted as true, were signs of encephalopathy in Plaintiff.

50.      For his part, Dr. Suite considered the post-May 19 neurological evaluations and concluded that:

> [M]y impression reading the records was, since this was a visit that was undertaken by neurology at a particular time, it bears consideration in the context of all of the other data, all of the other records that are in the chart as well as what the family had observed. So with the kind of problems that Mr. Jordan was having that appeared to be waxing and waning throughout that interim period, I believe that when they saw him, they didn't really have a baseline to go on at the time they saw him, but at the same time when they saw him, he was doing a little bit better and he seemed to be functioning pretty well. But it still doesn't take away from the fact that the other caregivers on each day documented elements of confusion and disorientation and inappropriate behavior, those sorts of things.

34

(*Id.* 233.) So, as we have said above, Dr. Suite considered a far broader spectrum of evidence than did Dr. Bernstein, but the Court has discussed this aspect of Dr. Bernstein's opinion in greater detail because his refusal to consider or credit the family members' reports or, for the most part, the notes from the other Hines providers between May 19 and May 26, took him farther over the line from expert to advocate for the defense. The Court particularly noted the mischaracterization Dr. Bernstein made of Plaintiff's mother's report of Plaintiff's marked memory decline after the first surgery as having come "years later" (*id.* 581), which either suggests that he thought she was fabricating the observation in support of litigation or at least demonstrates the wide disconnection between the evidence as a whole and Dr. Bernstein's analysis, insofar as he wrongly stated that the mother's report was "years later." That report was not "years later." It was on January 7, 2016, within a year of the May 19 surgery and long before suit was filed. Further, the mother's report prompted the neuropsychologist who heard it to create a contemporaneous note stating that Plaintiff's "[e]valuation results, available history, and reported symptom course suggest cerebrovascular insults, particularly his 2015 stroke, are *the primary etiology for Mr. Jordan's observed cognitive symptoms.*" (Joint Exhibit 1, Bates no. 5582 (emphasis added).) The Court does not believe this evidence was fabricated or an otherwise inaccurate recitation of Plaintiff's mother's observations, and Dr. Bernstein's baseless suggestion that the report was not presented earlier in the court of Plaintiff's treatment further weighted the scale of justice in favor of the Court's conclusion that Dr. Suite was the more credible expert witness.

**CONCLUSION**

51.     For the foregoing reasons, the Court reached a verdict of liability. The Court finds that Defendant breached the standard of care in connection with the May 19 procedure, and that those breaches as detailed above proximately caused the permanent cognitive injuries from which

Plaintiff continues to suffer today. As for Plaintiff's damages, the parties are directed to file simultaneous submissions. Plaintiff's submission and defendant's submission are due by noon on May 14, 2021, with a 15-page limit, and the parties' reply submissions are due by noon on May 28, 2021, with a limit of 10 pages.

**SO ORDERED.**

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: April 28, 2021**